UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **CRIMINAL NO.  H-4:17-cr-00651-4** |
| | § | |
| **MELISA DOMINGUEZ, a/k/a MISSY,** | § | |
| | § | |
| **Defendant.** | § | |

THE UNITED STATES OF AMERICA'S OPPOSITION TO
DEFENDANT'S MOTION FOR REVIEW OF A DETENTION ORDER

## I.     FACTUAL BACKGROUND[1]

### A.     Overview of the Conspiracy

The Southwest Cholos ("SWC") is a criminal organization based in Southwest Houston. In addition to its members, SWC also has associates operating throughout Texas, Mexico, and Central America who act in furtherance of its criminal scheme.

SWC members and associates are engaged in a variety of criminal conduct, including, but not limited to, the sex trafficking and smuggling of illegal aliens into and within the United States in exchange for a fee.

B.A.S. is a native, citizen and national of Honduras.  A.D. is a native, citizen and national of Mexico.  Chuanping Chen and Aihui Lin are natives and citizens of the People's Republic of China.  Wilvin Francisco is a native and citizen of the Dominican Republic.  Edgar Ernesto Martinez-Hercules, Elbin Jonathan Bonilla-Fajardo, Angel Balmore Quijada-Flores, Vilma Aracely Rivera-Guevara, and Jose Vidal Zelaya-Mejia are natives and citizens of El Salvador and Elbin Jonathan Bonilla-Fajardo was 16 years of age on July 24, 2017.  Heladio Santiago-

---

[1]  "The district court, in considering evidence, is unfettered as it would be if the district court were considering whether to amend its own action."  *United States v. Wilson*, 996, F.2d 308, 308 (5th Cir. 1993) (citing *United States v. Fortna*, 769 F.2d 243, 250 (5th Cir. 1985)).

Bautista is a native and citizen of Mexico.  Luis Veras-Figueroa is a native and citizen of the Dominican Republic.  All are aliens who entered the United States at a place other than a designated port of entry without being inspected by an immigration officer.  In addition, all paid a fee to human smuggling organizations in order to be smuggled into the United States without permission and then transported to specific locations in the United States.  SWC was a part of and worked with these human smuggling organizations to smuggle, transport, and harbor the aliens.

SWC members and associates assisted these aliens in crossing the United States-Mexico international border without inspection at a place other than a designated port of entry.  SWC members and associates also transported these aliens to one of many "stash houses" located in the Rio Grande Valley, which were controlled by Defendant.  SWC members and associates also concealed, harbored, and shielded from detection these aliens at a stash house, and transported them between stash houses.  SWC members and associates also transported or attempted to transport these aliens through and past United States Border Patrol checkpoints, including checkpoints located in Sarita, Texas and Falfurrias, Texas.  SWC members and associates also transported or attempted to transport these aliens to an area north of the United States Border Patrol checkpoint to another stash house located in or near Houston, Texas.  SWC members and associates also concealed, harbored, and shielded from detection, or attempted to conceal, harbor and shield from detection, these aliens at a stash house located in or near Houston, Texas.

In exchange for these illicit services, SWC members and associates, including Defendant, received a fee from the aliens, directly or through the larger human smuggling organization.  The fee varied by alien.  Some aliens paid prior to passage into the United States.  Some aliens paid a

portion of their earnings in the United States after they illegally entered.  SWC members and associates received a portion of the fee in exchange for their smuggling services.

**B.      The April, 2017 Smuggling**

On April 12, 2017, Defendant and co-defendant Maria Angelica Moreno-Reyna ("Patty") discussed over a court authorized wire intercept having B.A.S. smuggled into the United Sates so that B.A.S. could work as a prostitute in a brothel operated by Patty and other co-defendants. Patty then discussed the matter with co-defendant William Lopez ("William"), who, at the time resided in Mexico, and, at the time, had B.A.S. was staying with William in preparation for her to illegally enter the United States where she would later work as a prostitute.  Patty stated that she would be sending $2,500 to William for B.A.S.'s illegal entry into the United States.  Patty then called co-defendant Israel Juarez Sifuentes ("Cerillo") and provided him (Cerillo) with the details of B.A.S.'s trip so that he (Cerillo) could pick her (B.A.S.) up in furtherance of her (B.A.S.) being smuggled into the United States to work as a prostitute.  Cerillo also told Patty how to pay him for the transportation.  Patty then spoke to William and informed him that she spoke to Cerillo so that he could transport B.A.S.  They also discussed how they would pay Cerillo.  On April 12, 2017, Cerillo told Patty that B.A.S. is arriving 15 minutes late in Miguel Aleman, which is a border city in Mexico.  Patty indicated that she would be providing Cerillo with the remainder of the payment.  On April 14, 2017, Cerillo requested the remainder of the payment for B.A.S.'s crossing from Patty.   Later that day, Defendant, who runs the organization's main stash house and stash house activities in the Rio Grande Valley in that at least two other illegal alien women who worked at Patty's brothels had stayed there previously after crossing the United States-Mexican border and before working at Patty's brothels in Houston, told Patty that she (Defendant) would pay the remainder.  Patty responded by telling

Defendant that she (Patty) will let Defendant know when and where to pick up B.A.S. after she crosses.  Later, Defendant informed Patty that B.A.S. just entered the United States illegally with Cerillo's help.  Defendant also stated that B.A.S. was at a ranch, was to be transported to Defendant's home, and then Defendant would have B.A.S. transported to San Antonio where she could be picked up by Patty.  However, Defendant subsequently called Patty to tell her that there was difficulty crossing the river, so they would try again later.  Then, on or about April 19, 2017, Defendant informed Patty that B.A.S. crossed the river and that she should pick up B.A.S. in San Antonio, which is where she would be taken.  On or about May 1, 2017, Patty stated that co-defendant Erik Ivan Alvarez-Chavez ("Ivan") had just picked up B.A.S. from San Antonio and was bringing her to Houston.  Afterwards, Defendant called Patty to inquire as to whether B.A.S. was still working as a prostitute.  Physical surveillance has established that B.A.S. later worked in a brothel controlled by Patty at the Carriage Way Apartment complex in Houston, Texas.

## C.    The July 17, 2017 Smuggling

On July 17, 2017, Defendant and Ivan discussed over a court authorized wire intercept the transportation of aliens from Defendant's place of operation in the Rio Grande Valley to Ivan's place of operation in Houston.  Ivan and Defendant then discussed the route they would take to pick up the smuggled aliens.  Ivan then spoke with co-defendant Jose Ruben Palomo-Martinez ("Palomo") about this transportation from Palomo's truck to Ivan's vehicle as well as future alien smuggling jobs.  Later that evening, Defendant asked Ivan if Palomo is coming. Ivan indicated he was and told her to tell him to meet at the Walmart.  Ivan then told Defendant to meet Palomo at the Walmart.  Ivan later called co-defendant Grisel Salas ("Salas"), who worked for Defendant and who was harboring the aliens in her stash house along with separately indicted   defendant   Luis   Veras-Figueroa   ("Veras-Figueroa"),   who   himself   had   also   been

smuggled into the United States by this conspiracy, and told her to calm the woman, Aihui Lin, with pills.  Salas stated that she did so by putting pills in her food.  Ivan then spoke with an individual identified as Yang Xiuping and updated him about the transportation of the Chinese individuals, who were later determined to be Chuanping Chen and Aihui Lin.  Ivan later called Salas and told her to look for the Gray Dodge Charger.  Salas then transported the smuggled aliens to Defendant.  Then, Defendant called Ivan to let him know that the aliens were picked up. Both Defendant and Salas told Ivan in phone calls that there were "problems" with the Chinese.

On the morning of August 17, 2017, Palomo's tractor-trailer, which he operated and owned with his wife, was fully loaded up the trailer with watermelons at the Food Bank Rio Grande Valley.  The watermelons were destined for Tulsa, Oklahoma.  Witnesses at the food bank indicated that Palomo witnessed the entire loading of the tractor trailer and closed the door himself.  It could not have been closed from the inside.  Palomo then drove approximately 15 minutes to a parking lot near Edinburg, Texas, where three aliens got into his trailer.  They were Chuanping Chen, Aihui Lin, and Wilvin Francisco.  The aliens could not have closed the door from the inside.  There were also no markings on the truck as to where it was headed.  Court authorized wire intercepts also indicated that fake identification documents were waiting for the two Chinese individuals at the SWC controlled stash house in Houston.  Palomo then approached the Falfurrias checkpoint, at which point "Kaylie," a canine, alerted the presence of humans in the tractor trailer.  An x-ray scan was then conducted and the three aliens were discovered in the back of the trailer right next to the door (they could not have been anywhere else in the trailer as it was full of watermelons).  They were not seatbelted and there was a substantial likelihood they could have been crushed by the watermelons.

The three aliens admitted to being in the United States illegally, to recently entering the United States illegally, and to paying between $14,000 and $40,000 to be smuggled into the United States and transported to their final destination in the northeastern portion of the United States.

**D.      The July 24, 2017 Smuggling**

On the evening of July 23, 2017, Edgar Ernesto Martinez-Hercules, Elbin Jonathan Bonilla-Fajardo, Angel Balmore Quijada-Flores, Vilma Aracely Rivera-Guevara, Jose Vidal Zelaya-Mejia, and Heladio Santiago-Bautista were picked up in a tractor-trailer from a mobile home near McAllen, Texas operated by Defendant after having recently entered the United States illegally.    The tractor-trailer was driven by Defendant's sister and Defendant was following the tractor trailer in her personal vehicle.    The aliens were taken through the Falfurrias checkpoint and to a gas station near San Antonio where co-defendant Denis Amaya-Caballero ("Denis") and Ivan were waiting in two separate cars.    Ivan was driving a grey Dodge Ram pickup and Denis was driving a black Chevrolet Trailblazer.    Denis and Ivan each transported three aliens.    When they reached Harris County, Harris County Sheriff Deputies first pulled over Denis for having a passenger not wearing a seatbelt.    All three aliens in his vehicle admitted to being in the country illegally and having paid approximately $7,000 to $10,000 each to be transported to Houston.    Then, after being read his *Miranda* rights, Denis admitted that he was transporting the aliens for profit.    He also admitted to acting in concert with the Ivan and the driver of the tractor trailer.    Specifically, Denis stated that Ivan offered to pay him $200 a person to transport the aliens.

Afterwards, Ivan was pulled over for an unsafe lane change and all of the aliens he was transporting admitted to be transported as illegal aliens to Houston and to paying between $7,000

and $10,000 to be smuggled to Houston. Three of the aliens were prior deports and one was an unaccompanied juvenile. Two of the aliens stated that they would not be allowed to leave the stash house they were supposed to go to in Houston until a further sum was paid.

Prior to the arrest, Patty discussed the matter with Ivan over a court authorized wire intercept and specifically discussed harboring the aliens once they arrived in Houston at the Carriage Way apartments, including ordering food on their behalf.

### E.    The November 7, 2017 Smuggling

On November 7, 2017 at 11:30 a.m., a traffic stop was conducted by the Hidalgo County Sheriff's Office and the Federal Bureau of Investigation of a silver Chevrolet Malibu with four occupants. Co-defendant Veras-Figueroa was the driver and he initially identified himself as Javier Enrique Cepeda, provided a driver's license with that identity, and claimed he was a U.S. citizen by way of birth in Puerto Rico. Co-Defendant Salas was one of the passengers and Veras-Figueroa stated that she was his common law spouse and they both resided at 2217 Mojave Street #2, Edinburg, Texas (hereinafter referred to as the "stash house"). Salas was taken into custody pursuant to an outstanding arrest warrant. Veras-Figueroa then admitted that the identity he provided was false and that he then provided his true name and admitted that he is an illegal alien from the Dominican Republic. Veras-Figueroa then indicated there were four illegal aliens being harbored at his and Salas' home and they granted law enforcement a written consent to search the residence and provided a key to the residence.

Another occupant in the car was found to be Guillermo Esteban Margarin-Saldana, who was an illegal alien from the Dominican Republic and who admitted to being transported by Salas and Veras-Figueroa after having just crossed the border illegally.

Law enforcement then searched the stash house at approximately 2:30 p.m. Eleven illegal aliens were discovered inside the residence. All 12 individuals (the 11 illegal aliens in the house and theone illegal alien in the car) were interviewed by Border Patrol Agents (BPA).

One interview was of Stalin Manuel Garcia-Polanco, A200-595-911, who waived his *Miranda* rights and admitted he was from the Dominican Republic, and illegally entered the United States on or about November 2, 2017 by crossing the Rio Grande River. Garcia-Polanco further stated that he was previously deported on May 5, 2010, and again on July 29, 2014, from New Orleans, Louisiana. Garcia-Polanco further stated that he paid $1,800 to be smuggled into the United States. Garcia-Polanco further stated that after crossing the Rio Grande River on or about November 2, 20107, and being transported to a different location, he later made arrangements with Veras-Figueroa to further smuggle him in the United States and that, as a result of those arrangements, Veras-Figueroa transported him within the United States to the stash house. Garcia-Polanco further stated that he was harbored, concealed and shielded from detection with 11 other illegal aliens by Salas and Veras-Figueroa at the stash house. Upon his arrival to this location, Garcia-Polanco indicated that Veras-Figueroa ordered him to enter the stash house and told him to stay inside.

Garcia-Polanco positively identified Veras-Figueroa out of a six-photograph array as the individual who transported him to the stash house, ordered him to stay inside of the stash house, and maintained the stash house. Garcia-Polanco positively identified Salas out of a six-photograph array as the other individual who maintained and managed the stash house.

Another interview conducted was that of Fabiana Roberta De Silva. After waiving her *Miranda* rights, she admitted that she left Brazil on or about September 1, 2017, and illegally entered the United States with three other illegal aliens on or about October 3, 2017 by crossing

the Rio Grande River.  Da Silva further stated that she was to pay $20,000 to be smuggled into the United States (specifically New Jersey), had already paid $1,000 of that total, and was to pay the remainder when she arrived at her final destination in New Jersey.  Da Silva further stated that she was taken to several homes during the first fifteen days after he illegal entry into the United States.  Eventually, she was transported to the stash house.  Da Silva further stated that she was harbored, concealed and shielded from detection with 11 other illegal aliens by Salas and Veras-Figueroa at the stash house.

Da Silva positively identified Salas and Veras-Figueroa out of separate six-photograph arrays as the individuals who maintained the stash house.

The other nine illegal aliens apprehended at the location were natives and citizens of Brazil.

Garcia-Polanco and Da Silva also stated that they were harbored, concealed and shielded from detection by Salas and Veras-Figueroa at the stash house as part of their payments to be smuggled into or within the United States and that they were instructed to not be too loud and not leave the apartment.

Salas and Veras-Figueroa indicated that they were hired to transport, harbor, conceal and shield from detection the undocumented aliens in furtherance of their illegal entry into the United States.  Both Salas and Veras-Figueroa admitted that they knew the aliens did not have documents and were illegally in the United States.

## F.    Illegal Re-entry

Co-Defendant Juan Carlos Cervantes, who was an associates of the SWC, was found to have been previously deported and then illegally re-entered the United States.  Cervantes had a common-law marriage relationship with Defendant and Defendant harbored him following his

9

deportation and travelled with him to Houston, Texas.  Moreover, after the indictment was filed and arrest warrants were issued, Defendant fled to Mexico with Cervantes and assisted him in evading arrest.

## G.    Post-Indictment Events

The above-mentioned defendants were indicted on November 2, 2017 and arrests were made and search warrants were executed on November 7, 2017.  During the arrests and searches, seven more illegal alien prostitutes were found at Defendant's brothel at the Carriage Way Apartment Complex.  In addition, Defendant was found to have four additional illegal aliens harbored at her stash house.  Defendant fled to Mexico with co-Defendant Cervantes upon learning about the arrest warrants.  She only returned after her family hired Joseph Connors, who eventually convinced her to surrender, but she did so without Cervantes.

Following the arrests, Defendant's sister Molly, a/k/a Magdalena Bazan, was debriefed and explained that she was a truck driver who engaged in transporting numerous illegal aliens from the Rio Grande Valley to the Houston vicinity on behalf of Defendant.  Similar debriefs and admissions were made by co-Defendant Palomo and his brother.

Further debriefs by cooperating witnesses also established that Defendant was well aware of the sex trafficking operation in Houston by the co-Defendants.  Specifically, numerous witnesses and co-Defendants explained that Defendant repeatedly visited co-defendant Patty, including at the Carriage Way Apartments.  Indeed, during at least one of these visits in which Defendant was assisting in the delivery of drugs to the brothel, Defendant became upset when her co-defendant and common-law husband ventured into the brothel due to her knowledge of the activity occurring inside.  Moreover, the co-defendants and witnesses also explained that numerous sex trafficking victims under the control of William Lopez, including A.D., a sex

trafficking victim, were transported from Mexico to the United States through Defendant's stash house and that Defendant knew she (A.D.), like B.A.S., was being transported to work as a prostitute.   Moreover, the co-defendants and witnesses also indicated that A.D. had severe injuries from being beaten by William when she arrived at Defendant's stash house.

## II.   ARGUMENT

### A.   Overview

"If, after a [detention] hearing, . . . the judicial officer finds that no conditions or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the person before trial."   18 U.S.C. § 3142(e).   This includes considering whether the defendant "poses a non-physical danger to other persons and to the community."   *United States v. Fortna*, 769 F.2d 243, 246 (5th Cir. 1995).

"Subject to rebuttal by the person, it shall be presumed that no conditions or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officer finds that there is probable cause to believe that the person committed" a violation of Title 21 of the United States Code where the maximum sentence of imprisonment is ten years or more or a violation of chapter 77 of Title 18, which includes 18 U.S.C. §§ 1591 and 1594.   18 U.S.C. § 3142(e)(3).   In other words, the statute "creates a rebuttable statutory presumption that respecting one indicted for certain . . . offenses, . . . no conditions of release exist that would reasonably assure the community's safety."   *United States v. Kay*, 82 F.3d 415, 415 (5th Cir. 1996) (citing *United States v. Rueben*, 974 F.2d 580, 586 (5th Cir. 1992)).

"[18 U.S.C.] § 3142(e) shifts to the defendant only the burden of rebutting evidence, not the burden of persuasion; however, the mere production of evidence does not completely rebut the presumption." *United States v. Rueben*, 974 F.2d 580, 586 (5th Cir. 1992).

Regarding the presumption, in *United States v. Hare*, 873 F.2d 796, 798-99 (5th Cir. 1989), the Fifth Circuit explained that:

> [The] presumption is not a mere "bursting bubble" that totally disappears from the judge's consideration after the defendant comes forward with evidence. . . . Congress intended that the presumption remain in the case as a factor to be considered by the judicial officer. Thus the mere production of evidence does not completely rebut the presumption, and in making its ultimate determination, the court may still consider the finding by Congress that drug offenders pose a special risk of flight and dangerousness to society. The statute thus seems to create an unusual set of weights and measures in which the burden of persuasion is on the government, not the defendant, but the presumption may be weighed in the evidentiary balance. . . .   [Defendant] offered no evidence to rebut the presumption that he would continue trafficking in drugs. Nor did [the defendant] address the issue in his motion for review. . . .   Since a detention order may rest on a determination that no condition or combination of conditions will reasonably assure either the defendant's appearance *or* the safety of the community, the court did not abuse its discretion in refusing to set aside the detention order.

(internal citations omitted).

At the hearing, the judicial officer shall determine if "any condition or combination of conditions . . . will reasonably assure the appearance of such person as required and the safety of any other person and the community."  18 U.S.C. § 3142(f).  Furthermore, at the hearing:

> The person shall be afforded an opportunity to testify, to present witnesses, to cross-examine witnesses who appear at the hearing, and to present information by proffer or otherwise. The rules concerning admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the hearing. The facts the judicial officer uses to support a finding . . . that no condition or combination of conditions will reasonably assure the safety of any other person and the community shall be supported by clear and convincing evidence.

18 U.S.C. § 3142(f).

Importantly, "proffered conclusory statements . . . made by life-long acquaintances of the [defendants] . . . that [they] were no danger to the community are not probative of the [defendants'] dangerousness." *Kay*, 82 F.3d at 415 n.6 (citing *Nordgren v. Hafter*, 789 F.2d 334, 339-40 n.4 (5th Cir. 1986)); *see also United States v. Hammond*, 44 F. Supp. 2d 743, 746 (D. Md. 1999) (proffer accorded limited weight); *United States v. Martin*, No. 13-cr-466, 2015 WL 3464937, at *3 (N.D. Cal. May 29, 2015) (conclusory statements at detention hearing are not material).  This only makes sense since there is insufficient information to evaluate the weight and reliability of the information contained in a proffer.

Additionally:

> The judicial officer shall , in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, take into account the available information concerning –
> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
> (2) the weight of the evidence against the person;
> (3) the history and characteristics of the person, including — (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

"If a person is ordered detained by a magistrate judge, . . . the person may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order."  18 U.S.C. § 3145(b).  In ruling on such a motion, release should not occur where there

are not reasonable assurances "of *either* the defendant's appearance or the safety of others or the community is sufficient; both are not required." *United States v. Fortna*, 769 F.2d 243, 249 (5th Cir. 1985). *See also United States v. Dugas*, No. 6:16-cr-23, 2016 WL 1704481, at *2 (W.D. La. April 26, 2016) ("For pretrial detention to be imposed on a defendant, the lack of reasonable assurance of either the defendant's appearance or the safety of others or the community, is sufficient; both are not required."). "The district court acts *de novo* and must make an independent determination of the proper pretrial detention or conditions of release." *United States v. Kay*, 82 F.3d 415, 415 (5th Cir. 1996) (citing *United States v. Rueben*, 974 F.2d 580, 585 (5th Cir. 1992)). Importantly, "[t]he district court, in considering evidence, is 'unfettered as it would be if the district court were considering whether to amend its own action. . . . Therefore, . . . the district court [does not] act[] as an appellate court in reviewing the magistrate's order." *United States v. Wilson*, 996 F.2d 308, 308 (5th Cir. 1993) (quoting *United States v. Fortna*, 769 F.2d 243, 250 (5th Cir. 1985)).

Importantly, and overlooked by Defendant in her motion, is the fact that 18 U.S.C. § 1594, and not just 18 U.S.C. § 1591, is an offense for which the rebuttable presumption applies. That offense is conspiracy to commit sex trafficking, which does not require that Defendant commit all of the overt acts of sex trafficking, but rather, only required that:

> *First*: That the defendant and at least one other person made an agreement to commit the crime of sex trafficking, as charged in the indictment;
> *Second*: That the defendant knew the unlawful purpose of the agreement and joined in it willfully, that is, with the intent to further the unlawful purpose; and
> *Third*: That one of the conspirators during the existence of the conspiracy knowingly committed at least one of the overt acts described in the indictment, in order to accomplish some object or purpose of the conspiracy.
> One may become a member of a conspiracy without knowing all the details of the unlawful scheme or the identities of all the other alleged conspirators. If a defendant understands the unlawful nature of a plan or scheme and knowingly and intentionally joins in that plan or scheme on one occasion, that is sufficient to

14

convict him for conspiracy even though the defendant had not participated before and even though the defendant played only a minor part.

The government need not prove that the alleged conspirators entered into any formal agreement, nor that they directly stated between themselves all the details of the scheme. Similarly, the government need not prove that all of the details of the scheme alleged in the indictment were actually agreed upon or carried out. Nor must it prove that all of the persons alleged to have been members of the conspiracy were such, or that the alleged conspirators actually succeeded in accomplishing their unlawful objectives.

*Fifth Circuit Jury Instructions,* § 2.15A (2019).

Therefore, Defendant's lack of involvement in acts of force, threats, fraud or coercion does not preclude the rebuttable presumption from applying. *See generally United States v. Roy*, 630 Fed. Appx. 169 (4th Cir. 2015); *United States v. Todd*, 627 F.3d 329, 334 (9th Cir. 2010) (18 U.S.C. § 1591 "does not require knowledge in the sense as to a future act, but only requires that the defendant know in the sense of being aware of an established modus operandi that will in the future cause a person to engage in prostitution," and 18 U.S.C. § 1594 does not require the conspirators to know the victim's background that is relevant to the definition of what acts are coercive).

**B.    There is Overwhelming Evidence That, Due to Defendant's Dangerousness and Risk of Flight, no Conditions of Release Can Reasonably Assure the Safety of Other Persons and the Community**

In *Kay*, the Fifth Circuit explained that because the defendants in that case were indicted for an offense listed in 18 U.S.C. § 3142(e)(3), "they bore the burden of producing evidence that their release would not pose a danger to the community . . . [and] [t]he production of evidence sufficient to rebut the presumption does not completely negate all the probative value of the facts underlying the presumption; the court may still consider the congressional finding that drug offenders pose a special risk of dangerousness to society."  82 F.3d at 415.  Accordingly, the Fifth Circuit reversed the District Court's order to release the defendants on bond. *Id.*

Similarly, in *Dugas*, that court explained that the statute does not "require that the defendant be the threat of danger versus cause of the danger," and explained that dangerousness was established by the defendant's history of violent behavior, gang activity, merely being "involved" in a shooting, and the "acts of violence [that] seem to follow [him]."   2016 WL 1704481, at *4.   Indeed, despite Defendant's contention to the contrary (*see* Doc. 264 at 11), gang membership is a well established basis of finding that a defendant is a danger to public safety.   *See United States v. Volksen*, 766 F.2d 190, 193 (5th Cir. 1985); *United States v. Piazza*, No. 1:09-cr-104, 2011 WL 13205910, at *3 (E.D. Tex. Jan. 21, 2011).

Likewise, in *Rueben*, the Fifth Circuit explained that "the risk of continued narcotics trafficking on bail does constitute a risk to the community . . . [and] the court may still consider the finding by Congress that drug offenders pose a special risk of flight and dangerousness to society."   974 F.2d at 586.   *See also United States v. Hare*, 873 F.2d 796, 798 (5th Cir. 1989) ("The risk of continued narcotics trafficking on bail constitutes a risk to the community.").

In *Rueben*:

[Defendants] have . . . not rebutted the presumption that they are a danger to the community.   The government presented substantial evidence to show that [defendants] have continuously engaged in the trafficking of drugs for several years, including while being on parole or shortly after being released from parole. [Defendants], on the other hand, have presented absolutely no evidence whatsoever to indicate that they will not continue to engage in drug trafficking if released on bail pending trial.   [Defendants] have therefore not overcome the presumption that they constitute a danger to the community.

974 F.2d at 586.   *See also Hare*, 873 F.2d at 79 (approving the magistrate's holding that the defendant would be a danger to the community where he offered no evidence that he would not continue to traffic drugs); *United States v. Barker*, 876 F.2d 475, 476 (5th Cir. 1989) (Government entitled to benefit of the presumption where it produced evidence that the

defendant had been dealing in drugs since his last release from prison even though some of the testimony it presented was later admitted to be inaccurate).

Here, Defendant has demonstrated through her extensive criminal activity regarding human smuggling as well as sex trafficking her propensity for fleeing and causing harm to others if released irrespective of whether the presumption of dangerous and flight exists.  Defendant fled the country and assisted another co-defendant is so doing upon finding out she was wanted. Moreover, in committing the underlying crimes, she placed aliens at risk of not just being lured into prostitution, but also having pills snuck into their food and placing them at risk of physical harm by the manner in which they were transported.

Defendant also aided and abetted, conspired, and committed acts in furtherance of the sex trafficking of the Southwest Cholos.  Specifically, she acted as the primary transporter including for William Lopez, who, as the detention hearing transcripts makes clear, caused significant physical harm to the women.

Defendant has a history of evading the legal system, having not only fled to a foreign country, but also assisting another in so doing.  As she only returned at the urging of her prior counsel, there is also no way to predict the lengths Defendant will go to avoid returning to court. Indeed, she even assisted another co-defendant is avoiding apprehension.

Defendant's motion provides no evidence, much less claim, that Defendant would not be a flight risk or danger to the community if released.  Instead, the motion merely claims that the United States failed to provide sufficient evidence of Defendant's commission of an offense for which a rebuttable presumption applies.  It is noted that, as Defendant was arrested pursuant to an indictment, there was no probable cause hearing.  It is also noteworthy that Defendant's motion is devoid of any indication as to how she would support herself (her sole basis of income

prior to her arrest was based on alien smuggling and trafficking) where she would live (her prior residence was a stash house), or any other evidence or claim that she would not be a flight risk or danger to the community.

Thus, any potential for a bond should be summarily denied.

**C.      Defendant's Contentions Are Meritless**

Defendant's motion misstates both the facts and law of the case.  First, Defendant claims that the extensive evidence of Defendant's involvement in the sex trafficking should be ignored because she did not engage in any acts constituting force, fraud, threats, or coercion.  However, that is not the standard for determining what evidence is relevant regarding risk of flight and dangerousness.  *See generally United States v. Montgomery*, 10 F. Supp. 3d 801, 836 (W.D. Tenn. 2014) (conduct in the indictment was only one of eight reasons for finding dangerousness).

Second, Defendant's motion is also completely silent about any assurance Defendant could provide to appear in Court.

Next, the case against defendant does not merely involve allegations involving prostitution, but rather sex trafficking and alien smuggling.  A review of the evidence in light of those jury instructions establishes that there is substantial evidence of Defendant's guilt of aiding and abetting and conspiring to engage in sex trafficking by force, fraud, threats, or coercion. Specifically, Defendant was the conduit by which many of the victims were brought to Houston from Mexico and she was recorded discussing their work as prostitutes in Court authorized intercepts.  Defendant's apparent belief that the evidence is "thin" because she did not further commit acts of violence against her only establishes his failure to comprehend the elements of the crime with which he is charged.

Furthermore, Defendant's summary of Agent Morales and Deputy Guerrero's testimony completely omits most of their direct examination wherein they explain in detail Defendant's risk of flight and dangerousness.

Moreover, as previously explained, "proffered conclusory statements . . . made by life-long acquaintances of the [defendant] . . . that [he is] no danger to the community are not probative of the [defendants'] dangerousness."  *Kay*, 82 F.3d at 415 n.6 (citing *Nordgren v. Hafter*, 789 F.2d 334, 339-40 n.4 (5th Cir. 1986)); *see also United States v. Hammond*, 44 F. Supp. 2d 743, 746 (D. Md. 1999) (proffer accorded limited weight); *United States v. Martin*, No. 13-cr-466, 2015 WL 3464937, at *3 (N.D. Cal. May 29, 2015) (conclusory statements at detention hearing are not material).  This only makes sense since there is insufficient information to evaluate the weight and reliability of the information contained in a proffer.

Here, Defendant has not even provided this insufficient amount of evidence regarding her lack of dangerousness or being a flight risk.  Instead, she has mistakenly claimed that she has served most of any sentence she would receive.  This is simply not correct.  Defendant has been in custody for approximately 26 months.  Defendant faces the possible Guideline sentence for solely the alien smuggling (a charge not contested in her motion):

Base offense (U.S.S.G. § 2L1.1(a)(3)) = 12

More than 25 aliens (U.S.S.G. § 2L1.1(b)(2)(B)) = +6

Minor smuggled (U.S.S.G. § 2L1.1(b)(4)) = +4

Recklessly created risk of serious bodily injury by medicating aliens and placing them in back of tractor-trailer full of watermelons (U.S.S.G. § 2L1.1(b)(6)) = +2

Harbored for purpose of prostitution (U.S.S.G. § 2L1.1(b)(8)) = +2

Organizer and leader of smuggling operation in Rio Grande Valley (U.S.S.G. § 3B1.1(a)) = +4

Total Offense Level = 30

At Criminal History Category I, Defendant's Sentencing Guideline range is 97-121 months, or 71-95 months in addition to the amount of time she has already served.  Thus, there is simply no basis for Defendant's conclusion that she is less likely to flee based on the amount of time she has already served.

### III.      CONCLUSION

For the foregoing reasons, there is no basis to disturb the magistrate judge's finding that Defendant should remained detained without bond.

Date:   January 24, 2020                    Respectfully submitted,

                                            RYAN K. PATRICK
                                            United States Attorney, Southern District of Texas

                                            By:      s/ Adam Laurence Goldman
                                            Adam Laurence Goldman
                                            Assistant United States Attorney
                                            Attorney-in-Charge
                                            S.D. Tex. ID No.: 1034195
                                            State Bar Nos.:  NY3038023/DC476521
                                            1000 Louisiana Street, 27th Floor
                                            Houston, Texas 77002
                                            Tel.: (713) 567-9534; FAX: (713) 718-3303
                                            E-mail:  Adam.Goldman2@usdoj.gov
                                            *Counsel for the United States of America*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 24th day of January, 2020, I electronically filed the

foregoing document with the Clerk of Court using CM/ECF, to which opposing counsel listed

below is a member and provided a copy via email:

Miguel Andres Sanchez-Ross
Parker & Sanchez, P.L.L.C.
700 Louisiana Street, Suite 2700
Houston, Texas 77002
Tel.:  713-659-7200; FAX:  713-659-7203
Email: andres@parkersanchez.us

                                            s/ Adam Laurence Goldman
                                            Adam Laurence Goldman
                                            Assistant United States Attorney